# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ARTHROCARE CORPORATION, )
         )
        Plaintiff, )    C.A. No. 07-729-SLR
         )
        v. )    **JURY TRIAL DEMANDED**
         )
GYRUS MEDICAL, INC., GYRUS ENT, L.L.C., )    **PUBLIC VERSION**
and GYRUS ACMI, INC., )
         )
        Defendants. )

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO
## DISQUALIFY PLAINTIFF'S COUNSEL WEIL, GOTSHAL & MANGES

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Gyrus Medical, Inc., Gyrus ENT., L.L.C.,*
*and Gyrus ACMI, Inc.*

OF COUNSEL:

Darle M. Short
Thomas J. Pardini
Daniel A. Tanner III
Daniel M. Schneider
OLIFF & BERRIDGE, PLC
277 S. Washington Street, Suite 500
Alexandria, VA 22314
Tel: (703) 836-6400

Dated: January 30, 2008
Public Version Dated: February 5, 2008
846455/32487

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................1

II.   FACTUAL BACKGROUND .........................................................................2

III.  CERTIFICATE UNDER D. DEL. LR 7.1.1 ................................................8

IV.   WEIL SHOULD BE DISQUALIFIED AS COUNSEL FOR
      ARTHROCARE ............................................................................................8

      A.   Relevant Law ........................................................................................9

      B.   Weil's First Conflict – Weil Represents ArthroCare Against Gyrus
           While Weil And Its Client Olympus Have A Common Legal Interest
           With Gyrus Group, With Regard To Overlapping Subject Matter ...........11

           1.   Weil and Olympus Have A Common Legal Interest With Gyrus
                Group And Gyrus .....................................................................11

           2.   Weil's Representation Of ArthroCare Conflicts With That
                Common Interest ......................................................................11

           3.   That Conflict Of Interest Violates Model Rule of Professional
                Conduct 1.7 ...............................................................................12

      C.   Weil's Second Conflict – Its Position Of Trust With Regard To
           Gyrus Group And Gyrus Conflicts With Its Representation of
           ArthroCare ..........................................................................................14

      D.   Weil's Disqualification Will Not Unduly Prejudice ArthroCare ...............16

      E.   Gyrus Group and Gyrus Have Not Waived The Conflicts .......................16

V.    CONCLUSION............................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Allen v. Academic Games Leagues of Am., Inc.,*
  831 F. Supp. 785 (C.D. Cal. 1993) ........................................................................... 15

*Conley v. Chaffinch,*
  431 F. Supp. 2d 494 (D. Del. 2006)................................................................. 8, 9, 10

*Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,*
  142 F. Supp. 2d 579 (D. Del. 2001)...................................................................... 9, 17

*In re Congoleum Corp.,*
  426 F.3d 675 (3d Cir. 2005) ........................................................................... 13, 17

*In re Teleglobe Communications Corp.,*
  493 F.3d 345 (3d Cir. 2007) ................................................................................. 11

*Kabi Pharmacia AB v. Alcon Surgical, Inc.,*
  803 F. Supp. 957 (D. Del. 1992)......................................................................... 9, 15

*Lease v. Rubacky,*
  987 F. Supp. 406 (E.D. Pa. 1997) ........................................................................ 12

*Morrison Knudsen Corp. v. Hancock, Rothert & Banshoft,*
  69 Cal. App. 4th 223 (1st Dist. 1999)................................................................ 14, 15

*Nemours Foundation v. Gilbane, Aetna, Fed. Ins. Co.,*
  632 F. Supp. 418 (D. Del. 1986)....................................................................... 13-14

*Webb v. E.I. DuPont de Nemours & Co., Inc.,*
  811 F. Supp. 158 (D. Del. 1992)....................................................................... 9, 10

## Other Authorities

D. Del. LR 83.6(d) ..................................................................................................... 9

Model Rule of Professional Conduct 1.7 .......................................................... 2, 12, 14

Restatement of Law Governing Lawyers, §121 ......................................................... 14

## TABLE OF EXHIBITS

Exhibit No.

1.    Declaration of Simon Shaw

2.    Declaration of Robert Gadsden

3.    Declaration of Nicholas Stuart, Esquire

4.    Declaration of Michael W. Jahnke, Esq.

5.    ████████████████████████████████

6.    ████████████████████

7.    ███████████████████

8.    String of E-Mails

## I.    **INTRODUCTION**

At the same time Weil, Gotshal & Manges ("Weil") filed the complaint and represents

plaintiff ArthroCare Corporation ("ArthroCare") against defendants Gyrus Medical, Inc., Gyrus

ENT, LLC and Gyrus ACMI, Inc. (collectively "Gyrus") in this case, Weil represented and

continues to represent Olympus Corporation ("Olympus") in its acquisition of Gyrus Group PLC

("Gyrus Group"), the parent of all three Gyrus defendants. Those concurrent representations

result in at least two conflicts of interest for Weil.

First, Olympus's acquisition of Gyrus Group and Gyrus is a friendly acquisition. The

parties, and their counsel, are working closely together to complete the acquisition and have a

common legal interest in that regard. In fact, Weil and Gyrus Group's acquisition counsel

entered into a Common Interest Agreement and Olympus and Gyrus Group entered into an

Implementation Agreement regarding the parties sharing certain confidential information and

attorney work product to complete the acquisition, while maintaining the confidentiality of the

confidential information and the discovery-exempt status of the attorney work product. Some of

that confidential information and attorney work product are relevant to this case. Specifically,

the complaint in this case alleges that the use of certain Gyrus Group products that embody its

PK technology infringe an ArthroCare patent. The Gyrus Group confidential information and

attorney work product provided to Weil as Olympus's counsel includes information on Gyrus

Group's PK technology, the products embodying the technology, the uses of those products, and

competitive information regarding the products. That puts Weil in a position of conflict.

Second, Weil is in a position of trust with regard to Gyrus Group's confidential

information and attorney work product. Weil's representation of ArthroCare conflicts with that

position of trust.

Because of those conflicts, Weil should be disqualified pursuant to Model Rule of Professional Conduct 1.7.

## II.    FACTUAL BACKGROUND

Weil's representation of Olympus in its acquisition of Gyrus Group began at least by October, 2007, and continues to date. Exhibit 1, ¶ 2; Exhibit 3, ¶ 2. The complaint in this case was filed by Weil on behalf of ArthroCare on November 14, 2007, and Weil's representation of ArthroCare in this case also continues to date. Thus, Weil's representations of ArthroCare and Olympus have indisputably overlapped, and continue to overlap.

As discussed above, Olympus's acquisition of Gyrus Group is a friendly acquisition, not a hostile or adverse acquisition. Gyrus Group has cooperated fully with Olympus and Weil, worked jointly and closely with Olympus and Weil, and shared its confidential information and attorney work product with Olympus and Weil to bring the acquisition to fruition. Exhibit 1, ¶ 3; Exhibit 2, ¶ 3.

In that regard, Olympus entered into a confidentiality agreement with Gyrus Group on September 10, 2007[1], to consider "mutually beneficial business development opportunities," including Olympus's acquisition of Gyrus Group. Exhibit 1, ¶ 4; Exhibit 2, ¶ 4; Exhibit 3, ¶3; Exhibit 5, p. 1. The agreement provides that the parties can exchange confidential information without the information losing its confidential status. Exhibit 1, ¶ 4; Exhibit 2, ¶ 4; Exhibit 3, ¶3; Exhibit 5, pp. 2-3. The parties' respective counsel, including Weil, are covered by the agreement. Exhibit 1, ¶ 4; Exhibit 5, p. 1.

Pursuant to that agreement, Gyrus Group provided confidential business information to Olympus and its attorneys, Weil, for use solely in evaluating the business opportunities with

---

[1] The confidentiality agreement is Exhibit 5.

Gyrus Group. Exhibit 1, ¶ 5; Exhibit 3, ¶ 4. Weil participated in various meetings and telephone conferences with Gyrus Group and its counsel during which Gyrus Group's and Gyrus's confidential information was discussed. Exhibit 1, ¶ 7; Exhibit 4, ¶ 9. Gyrus Group shared that information with Weil because it was Gyrus Group's understanding that it had a legal common interest with Olympus and Weil. Exhibit 1, ¶ 7. Gyrus Group employees freely answered questions about that information from Olympus and Weil, without knowing about Weil's adverse position to Gyrus Group in this case. *Id.*

Those discussions included Gyrus Group's confidential information about its PK technology and products embodying that technology. *Id.* In fact, Olympus was very interested in the PK technology and the Gyrus Group products embodying that technology. *Id.* It is Gyrus Group's understanding that one of the primary reasons Olympus wanted to acquire Gyrus Group was the PK technology and products. *Id.*

An example of the Gyrus Group/Olympus/Weil discussions follows. On November 13, 2007, Mr. Simon Shaw (Gyrus Group's Chief Financial Officer), Mr. Robert Gadsden (Gyrus Group's Vice President of Group Legal and Intellectual Property Affairs) and Gyrus Group's acquisition counsel met with Olympus representatives and Weil as part of Olympus's and Weil's due diligence. Exhibit 1, ¶ 8; Exhibit 2, ¶ 6; Exhibit 3, ¶ 6. Messrs. Shaw and Gadsden provided Gyrus Group's confidential information to Weil and answered questions from Weil regarding Gyrus Group's intellectual property license agreements (including the Gyrus Group/ArthroCare licenses), various contracts, outstanding disputes, prior patent infringement cases (including settlement of the cases), the prior patent infringement litigation between ArthroCare and Ethicon, and the Gyrus Group products embodying the PK technology. *Id.* Gyrus Group had no

knowledge of the ArthroCare complaint that was filed by Weil the next day. Exhibit 1, ¶ 8; Exhibit 3, ¶ 6.

Also, certain of Gyrus Group's and Gyrus's confidential information requested by Olympus and Weil was put into a "data room," which was a conference room in Gyrus Group's counsel's London offices having restricted access. Exhibit 2, ¶ 5; Exhibit 3, ¶ 4. Examples of data placed in the data room include Gyrus Group's intellectual property licensing agreements, supply agreements, details and analyses of litigation and other proceedings and potential liabilities, joint venture agreements, communications with governmental and regulatory authorities, information about Gyrus Group's technology and products (including the Gyrus Group products that are the subject of the infringement allegations in this case), competitive information, and other confidential and proprietary corporate information. Exhibit 2, ¶ 5. Such information is of great value to any entity acquiring Gyrus Group *and* any entity bringing litigation against Gyrus, and would be highly useful to Weil in its representation of ArthroCare in this lawsuit. *Id.*

Weil had unrestricted access to Gyrus Group's and Gyrus's confidential information in that data room. Gyrus Group granted Weil that unrestricted access on the reasonable assumption that all parties, including Weil, were operating in good faith for a common legal interest. According to the data room log, at least ten Weil employees accessed that data room between November 7 and 14, 2007, on multiple occasions. Exhibit 3, ¶ 5.

In addition, some of Gyrus Group's confidential information was sent electronically to Weil, including prior to November 14, 2007. Exhibit 3, ¶ 4. In fact, on November 8, 2007, Weil requested that certain confidential information of Gyrus Group be sent to Weil electronically so

4

that it could be forwarded to Weil's New York office. *Id.* Gyrus Group's acquisition counsel complied with that request. *Id.*

At the time Gyrus Group consented to Weil's access to Gyrus Group's and Gyrus's confidential information, Gyrus Group did not know ArthroCare was going to sue Gyrus and that Weil would be representing ArthroCare. Exhibit 1, ¶ 6. Weil did not disclose those important facts to Gyrus Group. If Gyrus Group had known at that time that Weil was going to be representing ArthroCare in this case, Gyrus Group would not have consented to Weil having access to its confidential information as counsel for Olympus. *Id.*

To further carry out its responsibilities in representing Olympus in Olympus's acquisition of Gyrus Group, Weil entered into a Common Interest Agreement[2] with Gyrus Group's counsel on November 12, 2007. Exhibit 4, ¶ 4. That agreement was entered into at the outset of a meeting on November 12, 2007 involving Gyrus Group management, Gyrus Group's acquisition counsel and Weil. *Id.* Weil is a party to and signatory of the Common Interest Agreement. *Id.*; Exhibit 6. The Common Interest Agreement governs the exchange of confidential and proprietary information, attorney work product, and attorney-client privileged communications in pursuit of the parties' joint effort to "permit maximum effective pursuit of" Olympus's acquisition of Gyrus Group. *Id.*

By the time the Common Interest Agreement was consummated, Weil already had unrestricted access to the data room and had received Gyrus Group's confidential information electronically, as discussed above. Also, the Common Interest Agreement was consummated before Gyrus Group knew that ArthroCare was filing this case, and before Gyrus Group knew that Weil was representing ArthroCare in this case. Weil did not advise Gyrus Group of that

---

[2] The Common Interest Agreement is Exhibit 6.

conflicting representation. Gyrus Group had no notice or inclination that Weil had a conflicting interest to Gyrus Group.

The Common Interest Agreement acknowledges, *inter alia*, that the parties would pool "their individual work product" to bring Olympus's acquisition of Gyrus Group to fruition, that confidential information, attorney work product and attorney-client communications will be exchanged, and that "the parties rely on the common interest and joint defense exceptions to the waiver of the attorney/client and attorney work product privileges." Exhibit 4, ¶ 5; Exhibit 6.

In accordance with the Common Interest Agreement, during the November 12, 2007 meeting, Gyrus Group shared with Weil its attorney work product and confidential information, including work product and confidential information regarding Gyrus Group's PK product line. Exhibit 4, ¶ 6.

The parties to the acquisition, Olympus and Gyrus Group, next entered into an Implementation Agreement[3] on November 19, 2007, the same day the acquisition was publicly announced. Exhibit 3, ¶¶ 7-8 ; Exhibit 4, ¶ 7. The Implementation Agreement was prepared by Weil and bears only Weil's name on the cover. Exhibit 3, ¶ 8; Exhibit 7, p. 1. That agreement sets forth the coordinated, joint steps Olympus and Gyrus Group would take to complete Olympus's acquisition of Gyrus Group. Exhibit 3, ¶ 8; Exhibit 4, ¶ 7; Exhibit 7. The agreement explicitly covers all subsidiaries of Gyrus Group, including the three Gyrus defendants. Exhibit 3, ¶ 8; Exhibit 7, p. 3. The agreement provides that both parties, and their counsel, including Weil, will work together to bring Olympus's acquisition of Gyrus to fruition, including sharing confidential information and attorney work product, such as drafts of proposed regulatory filings for review by counsel for the other party. Exhibit 3, ¶ 9; Exhibit 4, ¶ 8; Exhibit 7, pp. 6-8. The

---

[3] The Implementation Agreement is Exhibit 7.

Implementation Agreement also precludes Gyrus Group from soliciting or participating in any way with competing bids from third parties. Exhibit 3, ¶ 9; Exhibit 7, p. 16.

As required by the Implementation Agreement, Gyrus Group's acquisition counsel provided drafts of the documents counsel intended to submit to the FTC on behalf of Gyrus Group to Weil for Weil's pre-submission review. Exhibit 4, ¶ 10. Those drafts included Gyrus Group's and Gyrus's confidential and proprietary information and attorney work product, including as to Gyrus Group's PK product line. *Id.* Some of the documents sent to Weil by Gyrus Group's acquisition counsel were labeled "privileged and confidential attorney work product and joint defense material." Exhibit 4, ¶ 11.

The first of Weil's conflicts is readily clear from one particular series of events, partially described above. As discussed above, on November 13, 2007, in its capacity as Olympus's counsel, Weil interviewed Mr. Shaw and Mr. Gadsden about, *inter alia*, Gyrus Group's and Gyrus's intellectual property matters, including prior patent infringement cases, the prior case between ArthroCare and Ethicon and the Gyrus Group/ArthroCare licenses, and the Gyrus Group products in suit. The next day, November 14, 2007, Weil filed the complaint against Gyrus on behalf of another client, ArthroCare, alleging that use of those products infringe an ArthroCare patent. Exhibit 2, ¶ 7. Gyrus Group's management, including Mr. Shaw and Mr. Gadsden, were immediately summoned to a meeting with Olympus and Weil to discuss the ArthroCare litigation, Gyrus Group's defenses and chance of success, and the litigation's possible impact on Olympus's acquisition of Gyrus Group. Exhibit 1, ¶ 9; Exhibit 2, ¶ 8. While Gyrus Group's management refused to attend the meeting if Weil participated (the meeting took place with substitute counsel for Olympus (*Id.*)), the conflict is exemplified by the meeting.

Weil's second conflict is that Weil has a position of trust regarding Gyrus Group's and Gyrus's confidential information and attorney work product. That position of trust conflicts with Weil's representation of ArthroCare.

## III.    CERTIFICATE UNDER D. DEL. LR 7.1.1

The undersigned avers, pursuant to D. Del. LR 7.1.1, that a reasonable effort was made to reach agreement with ArthroCare on the matters of this motion. Such effort included an exchange of correspondence (Gyrus's counsel's letter was sent December 20, 2007 and ArthroCare's counsel's letter was sent January 11, 2008), and a January 14, 2008 telephone conference involving counsel. No agreement was reached.

## IV.    WEIL SHOULD BE DISQUALIFIED AS COUNSEL FOR ARTHROCARE

While motions to disqualify are generally disfavored in this Court, *see, e.g., Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006), *citing Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994), Weil's concurrent representations of (1) ArthroCare against Gyrus in this case and (2) Olympus in its acquisition of Gyrus Group (and Gyrus), with Olympus having a legal common interest with Gyrus Group and Gyrus, and with the matters having overlapping subject matter, results in at least two conflicts that can only be resolved by Weil's disqualification. The first conflict is Weil being counsel for ArthroCare, adverse to Gyrus, while being counsel for Olympus, working with Gyrus Group and its counsel under the common interest doctrine, on overlapping subject matter. The second conflict is that due to its representation of Olympus in Olympus's acquisition Gyrus Group, Weil received and analyzed Gyrus Group's and Gyrus's confidential information and attorney work product. Weil is in a position of trust with regard to Gyrus Group and Gyrus and that information. That position of trust conflicts with Weil's representation of ArthroCare with regard to common subject matter.

8

A.    **Relevant Law**

"District courts are authorized to supervise the conduct of attorneys who practice before them." *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 960 (D. Del. 1992). To that end this Court has adopted the Model Rules of Professional Conduct. D. Del. LR 83.6(d).[4]

In carrying out its supervisory function, "a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *Kabi Pharmacia AB*, 803 F. Supp. at 960, citing *International Business Mach. Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978). It is important that counsel avoid even the appearance of impropriety because "[t]he maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is" important. *Id. See also Webb v. E.I. DuPont de Nemours & Co., Inc.*, 811 F. Supp. 158, 160 (D. Del. 1992).

The mode of analysis required in disqualification cases is "to carefully sift 'all of the facts and circumstances' and weigh the same against the specific goals and objectives" of the applicable rules. *Cf. Pennwalt Corp.*, 85 F.R.D. at 269 (applying the ABA's Model Code of Professional Responsibility), *citing, in part, Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 543 (3d Cir. 1977). The standard for motions to disqualify in this Court is that "[t]he party seeking disqualification must 'clearly show[ ] that continued representation would be impermissible.'" *Conley*, 431 F. Supp.2d at 496. In applying the standard, the Court should focus on the

---

[4] Some of the cases cited in this brief predate this Court's adoption of the ABA's Model Rules of Professional Conduct. Those earlier cases are from time periods when the Court followed the ABA's Model Code of Professional Responsibility or the Delaware Rules of Professional Conduct. However, the cases after the adoption of the ABA's Model Rules of Professional Conduct cite the earlier cases as precedent. *See, e.g., Conley, supra.*, and *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 581 (D. Del. 2001), *citing Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264 (D. Del. 1980) ("Although the court in *Pennwalt* was applying the Code of Professional Responsibility, the basic inquiry remains the same ..."). The legal principles pronounced in the earlier cases are still viable law, even if the specific model rule language is different.

information that *might* have been acquired by the conflicting representations and not just the actual information that is received by the conflicting representations. *Conley*, 431 F. Supp.2d at 498. *See also Webb*, 811 F. Supp at 161 (holding that it does not have to be shown that actual conflicting information was gained by the attorney with the conflict; rather, it only has to be shown that the conflicting matters are "substantially related," *quoting Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972)).

As discussed in this brief, the evidence clearly shows that Weil actually (not "might have") received confidential information and attorney work product from Gyrus Group and Gyrus, due to its common interest representation of Olympus, that is relevant to this lawsuit. Thus, Gyrus's showing exceeds the requirements of this Court.

Moreover, not only is factual information that might have been gained by the conflicting representations considered, the "impressions" about a client an attorney gained from the conflicting representation are to be considered. *Conley*, 431 F. Supp.2d at 500. Weil certainly received "impressions" about Gyrus Group and Gyrus that are relevant to this case. For example, Weil discussed with Gyrus Group its settlement of past litigation, which information is important to adverse counsel.

Finally, it is irrelevant whether the information from the first representation is discoverable in the second case. As stated in *Webb*, 811 F. Supp. at 162, "[i]t is immaterial that those [confidential] documents would be available to any attorney in discovery."

10

B. **Weil's First Conflict – Weil Represents ArthroCare Against Gyrus While Weil And Its Client Olympus Have A Common Legal Interest With Gyrus Group, With Regard To Overlapping Subject Matter**

    1. **Weil and Olympus Have A Common Legal Interest With Gyrus Group And Gyrus**

The Common Interest Agreement and the Implementation Agreement, which are discussed in detail above, memorialize the fact that Gyrus Group and Olympus have a joint legal interest in the common goal of Olympus acquiring Gyrus Group, which both parties want to occur. The parties and their counsel, including Weil, worked together and shared confidential information and attorney work product to further that joint interest and to reach that common goal, including to obtain the FTC's approval of the acquisition.

The subject agreements specifically invoke the common interest or community of interest doctrine that allows parties to share confidential information and attorney work product under circumstances such as this, without having to disclose it to others. *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 364 (3d Cir. 2007).

    2. **Weil's Representation Of ArthroCare Conflicts With That Common Interest**

As discussed above, the complaint in this case alleges that use of certain Gyrus Group products embodying its PK technology infringes an ArthroCare product. The confidential information and attorney work product that Gyrus Group provided Weil pursuant to the confidentiality agreement, the Common Interest Agreement, and the Implementation Agreement included information about those products, the uses of those products, and other competitive information about those products. That confidential information and work product also included information about Gyrus Group's patent licenses and settlements of prior patent infringement cases. All of that information would be very useful to Arthrocare in its patent infringement suit against Gyrus. That is a conflict of interest by Weil.

Weil acknowledged the conflict. In an e-mail sent November 16, 2007, Weil partner Ian Hamilton wrote to A&O attorney Ian Lopez:

> ... we recognize that [Gyrus Group] has a legitimate concern to ensure that no confidential information obtained by us as a result of our due diligence on [Gyrus Group] or otherwise in relation to the transaction is, or could be, used in a manner which might prejudice your client.

Exhibit 8, p. 1. The e-mail also erroneously states that "any question of conflicts of interests is, of course, a matter solely between us and our clients" and misrepresents that "the litigation is being run out of our Silicon Valley office with no involvement of our London office or, so far as I am aware, any of our other offices." To the contrary, Weil's New York office is involved both in this case (the complaint identifies an attorney of Weil's New York office as "of counsel") and the Olympus acquisition of Gyrus Group.

This Court should not permit Weil to be a legal foe and legal friend to Gyrus Group and Gyrus on overlapping subject matter.

### 3.   That Conflict Of Interest Violates Model Rule of Professional Conduct 1.7

Model Rule 1.7 "provides that an attorney may not represent two clients when representation of one would be 'directly adverse' to or would 'materially limit' representation of the other, unless the attorney 'reasonably believes' that one client would not be 'adversely affected'" by representation of the other. *Lease v. Rubacky*, 987 F. Supp. 406, 407 (E.D. Pa. 1997). In this case, ArthroCare's lawsuit against Gyrus adversely affects Olympus and Gyrus Group, who has a legal common interest with Olympus. Further, Weil's representation of ArthroCare in a lawsuit against Gyrus should be materially limited by its responsibilities to its client Olympus and to Gyrus Group under the common interest doctrine, because it cannot

zealously represent ArthroCare while at the same time zealously representing Olympus[5] and

adhering to its obligations to Gyrus Group under the confidentiality agreement, the Common

Interest Agreement and the Implementation Agreement. Weil acquired information from its

representation of Olympus that would be of use to its client ArthroCare in this case, but Weil

should not use that information in this case. *In re Congoleum Corp.*, 426 F.3d 675, 688 (3d Cir.

2005).

This Court found a common interest representation as sufficient basis for attorney

disqualification in *Nemours Foundation v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 423-

24 (D. Del. 1986). In *Nemours Foundation*, the conflicted attorney had received relevant

information from a first co-defendant while representing a second co-defendant having a

common interest with the first co-defendant. The receipt of that information disqualified him

from representing a plaintiff against the first co-defendant. *Id.* That rationale applies here.

Moreover, any promises by Weil to keep the Gyrus Group confidential information and

attorney work product gained by its representation of Olympus separate from the ArthroCare

litigation are inadequate. As stated in *Pennwalt Corp.*, 85 F.R.D. at 270:

> A lawyer's good faith, although essential in all his professional activity, is
> nevertheless, an inadequate safeguard when standing alone ... The dynamics of
> litigation are far too subtle, the attorney's role in that process is far too critical,
> and the public's interest in the outcome is far too great to leave room for even the
> slightest doubt concerning the ethical propriety of a lawyer's representation in a
> given case.

Even if Weil seeks to prove that an "ethical wall" has been constructed, that allegation

should not preclude disqualification. First, the alleged ethical wall was at best belatedly

implemented. The timing of the implementation of the ethical wall is important. *Nemours*

---

[5] In fact, Olympus's acquisition of Gyrus is scheduled to close around February 1, 2008. After
that, Weil will be, essentially, representing both sides in this lawsuit.

*Foundation*, 632 F. Supp. at 428. Second, those "behind" the wall must not share in any fees from the conflicted case. *Id.*, at 427.

While the general rule is that counsel can represent a parent corporation in one action and another party against a subsidiary of the parent corporation in a second action, an exception to that general rule is when counsel has access to confidential information relevant to the second suit. Restatement of Law Governing Lawyers, §121. Weil had, and has, access to Gyrus's confidential information due to its representation of Olympus that is relevant to this suit. *See Morrison Knudsen Corp. v. Hancock, Rothert & Banshoft*, 69 Cal. App. 4th 223, 245 (1st Dist. 1999) (confidential information law firm received as former counsel of parent company was substantially related to claim against subsidiary, so disqualification warranted).

Weil should therefore be disqualified from representing ArthroCare for violation of Model Rule 1.7, given its representation of Olympus and its duty to Gyrus Group and Gyrus under the common interest doctrine.

**C.    Weil's Second Conflict – Its Position Of Trust With Regard To Gyrus Group And Gyrus Conflicts With Its Representation of ArthroCare**

As discussed above, Gyrus Group and Gyrus entrusted Weil with their confidential information and attorney work product with no notice that Weil would be adverse to them on overlapping subject matter. That position of trust is in conflict with Weil representing ArthroCare against Gyrus on overlapping subject matter. There is no doubt that Gyrus Group's and Gyrus's confidential information and attorney work product that Weil received in that position of trust would benefit its representation of ArthroCare against Gyrus, and thus should lead to Weil's disqualification.

More specifically, Weil's position of trust regarding Gyrus Group and Gyrus and representation of ArthroCare is a "concurrent conflict of interest." *See* ABA Center for

14

Professional Responsibility Comment on Rule 1.7: "[c]oncurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or *a third person* or from the lawyer's own interests" (emphasis added). Stated examples with regard to third persons include "fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director." *See also Kabi Pharmacia AB*, 803 F. Supp. at 961 (counsel was disqualified for serving as an "advisor" to a client).

In *Morrison Knudsen Corp.*, 69 Cal. App. 4th 223, the court upheld the lower court's finding that the representation of a corporation's parent's underwriters conflicted with the simultaneous representation of a party against the corporation (the subsidiary) because counsel received relevant confidential information from its representation of the underwriters, even though counsel never represented the subsidiary. The relevant confidential information did not include information on the particular matter at hand; rather, it pertained to how the parent and subsidiary handled similar matters and the financial condition of the parent and subsidiary. The court upheld the disqualification of the counsel, citing *William H. Raley, Co. v. Superior Court*, 149 Cal. App. 3d 1042 (4th Dist. 1983), as authority for the legal proposition "that an attorney's receipt of confidential information *from a non-client* may lead to the attorney's disqualification" (emphasis in original). 69 Cal. App. 4th at 232-33. In the *Morrison-Knudsen* case, "the primary consideration for the (non)client in this instance is one of confidentiality rather than loyalty." *Id.*, at 234. *See also Allen v. Academic Games Leagues of Am., Inc.*, 831 F. Supp. 785 (C.D. Cal. 1993).

At the least, Weil owes the same duty of confidentiality to Gyrus Group and Gyrus, and should be disqualified for that additional reason.

### D.    Weil's Disqualification Will Not Unduly Prejudice ArthroCare

Weil's disqualification at this stage of the case should not delay this case. The complaint was filed November 13, 2007, and Defendants' Answer, Defenses and Counterclaim was filed January 7, 2008. ArthroCare has not yet replied the counterclaim. The initial scheduling conference is scheduled for February 6, 2008. No initial disclosures or discovery have been served. Another competent law firm can replace Weil, without causing any significant delay.

Moreover, ArthroCare and Weil were on notice as to the conflicts by at least November 16, 2007, when the conflicts were acknowledged by Weil, as discussed above. Gyrus's counsel again advised ArthroCare and Weil of the conflicts by its December 20, 2007 letter.

Further, this patent litigation is not unusually complex or unusual substantively, as the issues in this case are common in patent infringement cases. A replacement of Weil at this stage would not disadvantage ArthroCare in that regard. While Weil represented ArthroCare in two prior litigations regarding the patent-in-suit, the patent-in-suit has been reexamined by the U.S. Patent and Trademark Office after the most recent litigation, resulting in cancellation and amendment of many claims, as well as the addition of new claims. The reexamination was not handled by Weil. Thus, all parties, and all counsel, are working from a "clean slate" with respect to the patent-in-suit.

### E.    Gyrus Group and Gyrus Have Not Waived The Conflicts

By the time Gyrus Group and Gyrus became aware of Weil's conflicts (after the complaint in this case was filed on November 14, 2007), which was on the eve of the Olympus/Gyrus Group deal being announced, it was too late for the conflicts to be cured. Weil had had full access to, and had electronically received, Gyrus Group's and Gyrus's confidential information provided to Olympus and Gyrus Group's work product had been provided to Weil before Gyrus Group and Gyrus became aware of the conflicts. Gyrus Group and Gyrus could

16

not retract Weil's prior knowledge and use of that information in its representation of Olympus. The genie could not be stuffed back in the bottle.

The preferred waiver of conflicts is a *prospective* waiver, not a waiver after the fact. *Elonex*, 142 F. Supp.2d at 583. The prospective waiver should identify the potential opposing party, identify the nature of the dispute and permit the affected party to fully appreciate the potential effect of the waiver. *Id.* Further, the parties must be given the opportunity to object *before* the conflicting representation begins. *In re Congoleum Corp.*, 426 F.3d at 690. None of that was done in this case. Gyrus Group did not give a prospective, informed consent. Rather, as discussed above, Gyrus Group was told that the conflicts were only a matter to be addressed by Weil and its clients. See Exhibit 8, p. 1.

In *Elonex*, the Court distinguished the case from "the simple situation in which a trusting client has been betrayed by its attorney who unexpectedly filed suit against it on behalf of another." 142 F. Supp.2d at 584. That "simple situation" is present in this case. Gyrus Group and Gyrus had no forewarning that Weil would serve this complaint on Gyrus.

## V.    **CONCLUSION**

For at least the reasons given above, this Court should disqualify Weil due to the conflicts

of interest between its representation of ArthroCare in this case against Gyrus and its legal

common interest with Gyrus Group and Gyrus due to its representation of Olympus in Olympus's

acquisition of Gyrus Group.

Respectfully,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Darle M. Short
Thomas J. Pardini
Daniel A. Tanner III
Daniel M. Schneider
OLIFF & BERRIDGE, PLC
277 S. Washington Street, Suite 500
Alexandria, VA 22314
Tel: (703) 836-6400

Dated: January 30, 2008
Public Version Dated: February 5, 2008
846455/32487

By:   */s/ David E. Moore*
          Richard L. Horwitz (#2246)
          David E. Moore (#3983)
          Hercules Plaza, 6th Floor
          1313 N. Market Street
          Wilmington, DE 19899
          Tel: (302) 984-6000
          rhorwitz@potteranderson.com
          dmoore@potteranderson.com

*Attorneys for Defendants*
*Gyrus Medical, Inc., Gyrus ENT., L.L.C.,*
*and Gyrus ACMI, Inc.*

18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 5, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on February 5, 2008, the attached document was Electronically

Mailed to the following person(s):

Jack B. Blumenfeld
Karen Jacobs Louden
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
JBlumenfeld@MNAT.com
klouden@mnat.com

Nicholas Groombridge
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
nicholas.groombridge@weil.com

Jared Bobrow
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
jared.bobrow@weil.com

Cabrach J. Connor
Kevin Kudlac
Weil, Gotshal & Manges LLP
8911 Capital of Texas Highway, Suite 1350
Austin, TX 78759
cabrach.connor@weil.com
kevin.kudlac@weil.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

840224 / 32487

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARTHROCARE CORPORATION,                    )
                                           )
            Plaintiff/Counterdefendant,    )
                                           )
      v.                                   )
                                           )  Case No. 1:07-CV-00729-SLR
GYRUS MEDICAL, INC., GYRUS ENT, L.L.C.,    )
and GYRUS ACMI, INC.,                      )
                                           )
            Defendants/Counterclaimants.   )

## DECLARATION OF SIMON SHAW

I, Simon Shaw, hereby declare:

1.     I have been the Chief Financial Officer ("CFO") of Gyrus Group PLC ("Gyrus Group") since 2003. My job responsibilities include Gyrus Group's financial management, financial strategy and investor relations. Gyrus Group is the parent of defendants Gyrus Medical, Inc., Gyrus ENT, L.L.C. and Gyrus ACMI, Inc. (collectively "Gyrus").

2.     By at least the fall of 2007, Gyrus Group and Olympus Corporation ("Olympus") had begun discussions about Olympus acquiring Gyrus Group. Sometime in October, 2007 I learned that Olympus is represented by Weil, Gotshal & Manges ("Weil") with regard to Olympus's acquisition of Gyrus Group. I was Gyrus Group's "point person" for the initial discussions between Gyrus Group and Olympus, the subsequent negotiations, and, once Olympus's and Gyrus Group's management reached a tentative agreement as to the acquisition, Olympus's and Gyrus Group's joint and coordinated efforts to bring the acquisition to fruition.

3.     Olympus's acquisition of Gyrus Group is a friendly acquisition, not a hostile or adverse acquisition. Gyrus Group has cooperated fully with Olympus and Weil, worked jointly and closely with Olympus and Weil to bring the acquisition to fruition, and shared Gyrus Group's

EXHIBIT 1

confidential information and attorney work product with Olympus and Weil to bring the acquisition to fruition.

4.    In that regard, Gyrus Group and Olympus entered into a confidentiality agreement, which Olympus executed as the last signatory on September 10, 2007. That confidentiality agreement was entered into so that the parties could consider "mutually beneficial business development opportunities," including Olympus's acquisition of Gyrus Group. The agreement provides that the parties can exchange confidential information to further their common legal interest, i.e., Olympus's acquisition of Gyrus Group, without the information losing its confidential status. The parties' attorneys are covered by the agreement.

5.    Pursuant to that confidentiality agreement, Gyrus Group provided its confidential information to Olympus and Weil, for use solely in evaluating Olympus's business opportunities with Gyrus Group.

6.    At the time Gyrus Group consented to Weil's access to Gyrus Group's and Gyrus's confidential information, Gyrus Group did not know that ArthroCare Corporation ("ArthroCare") was going to sue Gyrus for patent infringement and that Weil would be representing ArthroCare. If Gyrus Group would have known those facts, Gyrus Group would not have consented to Weil's access to Gyrus Group's and Gyrus's confidential information at that time.

7.    I participated in various meetings and telephone conferences with Weil regarding the acquisition, during which Gyrus Group's and Gyrus's confidential information was shared and discussed. At the time, Gyrus Group shared that information with Weil because it was Gyrus Group's understanding that it had a legal common interest with Olympus, and Weil represented Olympus in that regard. I and other Gyrus Group employees were questioned about the information by Olympus and Weil, and freely answered the questions, without knowing about

2

Weil's adverse position to Gyrus Group in the ArthroCare litigation. Those discussions included confidential information about Gyrus Group's PK technology and the products embodying that technology. In fact, Olympus was very interested in the PK technology and the Gyrus Group products embodying that technology. It is my understanding that one of the primary reasons Olympus wanted to acquire Gyrus was that technology and those products. Thus, various of our discussions with Olympus and Weil focused on the PK technology and products, including pricing, sales and sales forecasts.

8.    As an example of my meetings and telephone conferences with Weil and Olympus, on November 13, 2007, Mr. Robert Gadsden, Gyrus Group's Vice President of Group Legal and Intellectual Property Affairs, and I met at the London offices of Allen & Overy (Gyrus Group's acquisition counsel) with various representatives of Olympus and three Weil lawyers, as part of Weil's due diligence. We provided information to and answered questions from Weil and its client, Olympus, regarding various matters, including Gyrus Group's prior patent infringement cases, the prior patent infringement litigation between ArthroCare and Ethicon, the Gyrus Group/ArthroCare licenses, and Gyrus Group's products embodying the PK technology. We did not know about the ArthroCare complaint that was filed the next day.

9.    After learning of the ArthroCare complaint on November 14, 2007, and after being requested by Olympus to discuss the ArthroCare litigation, Gyrus Group's defenses and chance of success in the litigation, and the litigation's possible impact on Olympus's acquisition of Gyrus Group, Gyrus Group's counsel, at our request, told Olympus that it was inappropriate for Weil to participate in those discussions. It was our strong belief that Weil had a conflict of interest because certain Gyrus Group and Gyrus confidential information given to Weil in the context of the Olympus acquisition of Gyrus Group is very relevant to the ArthroCare lawsuit.

3

10.     We continued to provide Olympus and Weil confidential information after November 14, 2007 because we were contractually bound to do so.  Moreover, there was no point in seeking to preclude Weil from having access to Gyrus Group's and Gyrus's confidential information after November 14, 2007 because the bulk of such information was conveyed to Olympus and Weil before then.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January _22_, 2008.

_____
Simon Shaw

4

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARTHROCARE CORPORATION, | ) |
| | ) |
| Plaintiff/Counterdefendant, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:07-CV-00729-SLR |
| GYRUS MEDICAL, INC., GYRUS ENT, L.L.C. | ) |
| and GYRUS ACMI, INC., | ) |
| | ) |
| Defendants/Counterclaimants. | ) |

## DECLARATION OF ROBERT GADSDEN

I, Robert Gadsden, hereby declare:

1.    I am the Vice-President of Group Legal and Intellectual Property Affairs of Gyrus Group, PLC ("Gyrus Group"), having its principal place of business in Winnersh, England. Gyrus Group is the parent corporation of defendants Gyrus Medical, Inc., Gyrus ENT, L.L.C., and Gyrus ACMI, Inc. (collectively "Gyrus").

2.    I have held my position at Gyrus Group, or a substantially equivalent position under a different title, for approximately seven and one-half years. My job responsibilities include coordinating the legal and intellectual property aspects of the business and technology strategy for Gyrus Group and all of its subsidiaries, including Gyrus, managing their intellectual property portfolio, drafting and advising on licenses and contracts, and conducting due diligence regarding potential acquisitions and technology.

3.    Gyrus Group is the subject of an ongoing, friendly acquisition by Olympus Corporation ("Olympus"). I was involved in the due diligence conducted by Olympus and its counsel in the acquisition, Weil, Gotshal & Manges ("Weil"), on Gyrus Group and Gyrus. In addition, there have been joint efforts by Gyrus Group and Olympus to obtain government regulatory approval of the acquisition. The due diligence and the governmental regulatory

EXHIBIT 2

approval efforts were cooperative activities, not adverse, as Olympus and Gyrus Group are working closely together to complete Olympus's acquisition of Gyrus Group.

4.    To assist Olympus and Weil in performing the due diligence that Olympus and Weil deemed necessary for the acquisition, Gyrus Group entered into a confidentiality agreement with Olympus (executed by Olympus on September 10, 2007), which enabled Olympus and Gyrus Group to share confidential and proprietary corporation information during the acquisition process, while maintaining the confidentiality of the information.

5.    Certain of Gyrus Group's and Gyrus's confidential information requested by Olympus and Weil was put in a "data room," which was a room in the London offices of Gyrus Group's acquisition counsel, Allen & Overy, with restricted access. I was responsible for collecting many of the documents and information that were placed in the data room. Those documents and that information included intellectual property licensing agreements, supply agreements, details and analyses of litigation and other proceedings and potential liabilities, joint venture agreements, communications with governmental and regulatory authorities, information about Gyrus Group's technology and products (including the Gyrus Group products that are the subject of the infringement allegations in this case), competitive information, and other confidential and proprietary corporate documents and information. Based on my experience with past litigation, it is my understanding that those documents and that information are relevant to various liability and damages issues in this case.

6.    On November 13, 2007, as part of Olympus's and Weil's due diligence, the Chief Financial Officer of Gyrus Group, Mr. Simon Shaw, and I met with various representatives of Olympus and Weil attorneys Ian Hamilton, Ed Jackson and Andrew Fox, and provided information to the Weil attorneys, and answered questions from the Weil attorneys, regarding

2

Gyrus Group's intellectual property license agreements (including the licenses with ArthroCare Corporation ("ArthroCare")), various contracts, outstanding disputes, and Gyrus's settlement of prior litigation, among other matters.

7.    Two days later, on November 15, 2007, I was notified by Mr. Shaw that a patent infringement lawsuit had been filed on November 14, 2007 against Gyrus by Weil, on behalf of ArthroCare. The lawsuit alleges that the use of Gyrus Group's products embodying its PK technology infringe an ArthroCare patent.

8.    Also on November 15, 2007, I was requested by Mr. Shaw to meet with Olympus and Olympus's attorneys the following day to discuss the just filed ArthroCare litigation and its possible impact on the potential acquisition of Gyrus Group by Olympus.

9.    I attended that meeting on November 16, 2007. Because Gyrus Group insisted that Weil not be present to hear Gyrus Group's side of the litigation, Olympus retained other counsel for the meeting. I was questioned about the ArthroCare litigation. Specifically, I was asked for and provided Gyrus Group's assessment of the likelihood that Gyrus would prevail in the ArthroCare litigation, and the reasons for those views. I answered questions about the products that were the subject of the litigation, how those products worked, what patents were involved, and the likely defenses that Gyrus would raise in the lawsuit. I was also asked for and provided Gyrus Group's views of the effect of the lawsuit on the value of Gyrus Group with respect to the acquisition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 24, 2008.

_____
Robert Gadsden

3

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARTHROCARE CORPORATION, | ) |
| | ) |
| Plaintiff/Counterdefendant, | ) |
| | ) |
| v. | ) Civ. No. 07-729-SLR |
| | ) |
| GYRUS MEDICAL, INC., GYRUS ENT, L.L.C. | ) |
| and GYRUS ACMI, INC., | ) |
| | ) |
| Defendants/Counterclaimants. | ) |

## DECLARATION OF NICHOLAS STUART, ESQUIRE

I, Nicholas Stuart, hereby declare:

1.     I am a British solicitor who is a senior associate at the law firm of Allen & Overy LLP ("A&O").

2.     A&O represents Gyrus Group PLC ("Gyrus Group") in Olympus Corporation's ("Olympus") acquisition of Gyrus Group. I first began working on Olympus's acquisition of Gyrus Group on October 3, 2007. The firm of Weil, Gotshal & Manges LLP ("Weil") was already involved, representing Olympus in the acquisition.

3.     Gyrus Group and Olympus entered into a confidentiality agreement, which Olympus executed as the last signatory on September 10, 2007. That confidentiality agreement was entered into so that the parties could consider "mutually beneficial business development opportunities." That agreement was later amended to provide that it was "for the purpose of planning for the integration of the Gyrus and Olympus businesses." The confidentiality agreement was designed to enable Gyrus Group to share with Olympus and Weil information it considered confidential and proprietary ("Gyrus Confidential Information") during the acquisition process, while maintaining the confidentiality of the information.

EXHIBIT 3

4.      Pursuant to that agreement, Gyrus Group provided Gyrus Confidential Information to Olympus and Weil, as requested by Olympus and Weil. That Gyrus Confidential Information was, in part, placed in a conference room in A&O's London offices, with access limited to the conference room. Some of the Gyrus Confidential Information was sent electronically to Weil, including prior to November 14, 2007. On one occasion, on November 8, 2007, Weil requested that certain Gyrus Confidential Information be sent to Weil electronically so that that Gyrus Confidential Information could be forwarded to Weil's New York office. A&O complied with that request.

5.      According to the data room log, at least ten (10) Weil employees accessed the data room between November 7 and 14, 2007, on multiple occasions.

6.      On November 13, 2007, Mr. Simon Shaw (the Chief Financial Officer of Gyrus Group), Mr. Robert Gadsden (Vice President of Group Legal and Intellectual Property Affairs of Gyrus Group) and various A&O attorneys, including myself, met with Weil and Olympus as part of Olympus's and Weil's due diligence regarding the acquisition. During that meeting, Gyrus Group's past lawsuits and various other intellectual property matters were discussed, including a patent license agreement between ArthroCare Corporation ("ArthroCare") and Gyrus Group. Various business aspects and the importance of that license, from Gyrus Group's perspective, were discussed. At that time, we had no information that Weil was going to be representing ArthroCare in this case, the complaint of which was filed the next day.

7.      By November 16, 2007, the acquisition terms were largely agreed to. In fact, the acquisition was announced on November 19, 2007.

8.      Also on November 19, 2007, Olympus and Gyrus Group entered into an Implementation Agreement, which sets forth the coordinated, joint steps Olympus and Gyrus

2

Group would take to complete Olympus's acquisition of Gyrus. That agreement explicitly covers all subsidiaries of Gyrus Group, including the three defendants in this case. The Implementation Agreement was drafted by Weil and bears only Weil's name on the cover.

9.      The Implementation Agreement provides that both parties, and their counsel, including Weil, will work together to secure satisfaction of "Regulatory Conditions", including a requirement that Gyrus Confidential Information and attorney work product, such as drafts of (and documents to be included with) proposed regulatory submissions, be shared by each party for review by counsel for the other party. The agreement also precludes Gyrus Group from soliciting or participating in any discussions or negotiations as to any third party bids that might compete with Olympus's acquisition proposal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 29, 2008.

Nicholas Stuart, Esquire

3

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARTHROCARE CORPORATION, | ) |
| | ) |
| Plaintiff/Counterdefendant, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:07-CV-00729-SLR |
| GYRUS MEDICAL, INC., GYRUS ENT, L.L.C., | ) |
| and GYRUS ACMI, INC., | ) |
| | ) |
| Defendants/Counterclaimants. | ) |

## DECLARATION OF MICHAEL W. JAHNKE, ESQ.

I, Michael W. Jahnke, Esq., hereby declare:

1.    I am a partner of the law firm of Allen & Overy LLP ("A&O"). I work in A&O's

New York offices, at 1221 Avenue of the Americas, New York, NY 10020. My primary area of

practice involves antitrust work in connection with mergers and acquisitions.

2.    A&O represents Gyrus Group, PLC ("Gyrus Group") with regard to Olympus

Corporation's ("Olympus") friendly acquisition of Gyrus Group. Olympus's counsel for the

acquisition is Weil, Gotshal & Manges LLP ("Weil").

3.    I am the A&O attorney who headed A&O's work on that acquisition with regard

to United States antitrust matters. As such, I worked with Weil on the antitrust review deemed

necessary for the acquisition, including preparation of the parties' respective submissions to the

Federal Trade Commission ("FTC").

4.    To enable Olympus and Weil to perform their antitrust review, and to lay the

groundwork for the parties to work together on the parties' respective submissions to the FTC, on

November 12, 2007, I met with Mr. Simon Shaw (Chief Financial Officer of Gyrus Group),

Mr. Charlie Goodwin (President of Worldwide Sales, Surgical and Endoscopy Division, Gyrus

EXHIBIT 4

ACMI), and three Weil attorneys. At the outset of that meeting, a Common Interest Agreement was entered into between my law firm, A&O, and Weil (both law firms are signatories), to govern the exchange of confidential and proprietary information, attorney work product, and attorney-client privileged communications in pursuit of a joint effort necessary to "permit maximum effective pursuit of the transaction".

5. The Common Interest Agreement acknowledges, inter alia, that Olympus and Gyrus would "pool their individual work product". The agreement further acknowledges that confidential information and attorney work product and attorney-client communications would be included in the "Confidential Materials" to be exchanged, and that "the parties rely on the common interest and joint defense exceptions to the waiver of the attorney/client and attorney work product privileges".

6. During the November 12 meeting, pursuant to the Common Interest Agreement, Messrs. Shaw and Goodwin and I shared with Weil information I considered subject to the attorney work product privilege and that I understood to be considered confidential by Gyrus Group (hereinafter, "Gyrus Privileged/Confidential Information"). This included discussion of Gyrus Group's PK product line, which I understand is a flagship product line of Gyrus Group.

7. On November 19, 2007, Olympus and Gyrus Group entered into an Implementation Agreement, which sets forth the coordinated, joint steps Olympus and Gyrus Group would take to complete Olympus's acquisition of Gyrus (the potential acquisition was publicly disclosed on that day).

8. The Implementation Agreement provides that both parties, and their counsel, including Weil, will work together to secure satisfaction of "Regulatory Conditions", including a requirement that confidential information and attorney work product, such as drafts of (and

2

documents to be included with) proposed regulatory submissions, be shared by each party for review by counsel for the other party.

9.    In accordance with the Common Interest Agreement and the Implementation Agreement, I participated in a number of telephone conferences and email exchanges with Weil during which Gyrus Privileged/Confidential Information was discussed.

10.    As required by the Implementation Agreement, A&O provided drafts of the documents A&O intended to submit to the FTC on Gyrus Group's behalf to Weil for Weil's pre-submission review. Those documents included Gyrus Privileged/Confidential Information, including as to Gyrus Group's PK product line. I also participated in telephone conferences with Weil regarding the parties' respective submissions to the FTC, during which Gyrus Privileged/Confidential Information was discussed. Those communications were all pursuant to the Common Interest Agreement and the Implementation Agreement.

11.    Some of the documents sent to Weil by A&O, including the draft FTC submissions, were labeled "privileged and confidential attorney work product and joint defense materials", and were considered by me to be such. Such documents were sent to Weil pursuant to the Common Interest Agreement and the Implementation Agreement.

12.    I believe that during this process, Gyrus Group and Olympus were not adversarial, but worked in a cooperative manner toward successful completion of the United States antitrust review process, including, as discussed above, sharing Gyrus Privileged/Confidential Information as expected under the Common Interest Agreement and in large part required by the Implementation Agreement.

13.    I was not aware that ArthroCare Corporation was planning litigation against Gyrus prior to the filing of the complaint in this case on November 14, 2007.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 26, 2008.

Michael W. Jahnke, Esq

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# Exhibit 8

**From:** Ian.Hamilton@weil.com [mailto:Ian.Hamilton@weil.com]
**Sent:** Friday, November 16, 2007 9:12 AM
**To:** Lopez, Ian:CO (LN)
**Cc:** michael.francies@weil.com
**Subject:** Gold: US litigation

Ian,

Further to our conversations yesterday evening I have had further discussions with my partners in London and the United States in relation to the ArthroCare patent litigation and Project Gold.

While any question of conflicts of interests is, of course, a matter solely between us and our clients, we are entirely satisfied that our continuing involvement in both matters does not present a conflict issue either in the UK or the US.

However, we recognise that Gold has a legitimate concern to ensure that no confidential information obtained by us as a result of our due diligence on Gold or otherwise in relation to the transaction is, or could be, used in a manner which might prejudice your client. In that regard:

- I do not believe that we have received any confidential information from you or your client which relates to the litigation. If you think otherwise, I should be grateful if you would identify the relevant information.

- We naturally accept that it would be inappropriate for us to receive any such information. Accordingly, we have advised our client that we are unable to advise on this element of the transaction and that we are unable to participate in any discussion of the ArthroCare litigation. We will ensure that no confidential information which may nevertheless inadvertently be received from Gold is shared between the transaction team and the ArthroCare team. The litigation is being run out of our Silicon Valley office with no involvement of our London office or, so far as I am aware, any of our other offices.

I hope that this satisfies any concerns which your client may have had.

Regards,
Ian

---

Ian Hamilton, Partner
Weil, Gotshal & Manges
One South Place, London, EC2M 2WG, UK
Tel: +44 20 7903 1534
Fax: +44 20 7903 0990
Mob: +44 7775 512 233

---

EXHIBIT 8



<Ian.Lopez@AllenOvery.com>
16/11/2007 11:19

To  <Ian.Hamilton@weil.com>
cc  <michael.francies@weil.com>
Subject  RE: Gold: US litigation (80616-00005)

File To Records:

Ian,

Thanks for your email and note your comments. I would comment as follows:-

1. I clearly cannot comment on any commercial or legal conflict you may or may not have.I also clearly cannot confirm whether you have any confidential information in your possession arising from this transaction which is relevant to the ArthroCare litigation.This is for you to determine.

2.In terms of confidential information relating to Gold,I note that this will be kept confidential by the Weil London Gin and Tonic team and not made available to others including your Athrocare Team. However, could you provide me with a solicitor's undertaking to this effect.Also could you confirm that this Gin Confidential Information is not discoverable by Athrocare in US litigation proceedings .We require these confirmations as a matter of urgency.

regards,


Ian



Ian Hamilton/LO/WGM/US
16/11/2007 16:09

To    Ian.Lopez@AllenOvery.com

cc    michael.francies@weil.com

Subject  RE: Gold: US litigation (80616-00005)

File To Records:

Ian,

I note your comments in paragraph 1.

In relation to paragraph 2, as I mentioned we are seeking to ensure that we do not receive any information, directly or indirectly, from your client in the course of Project Gold which relates to the relevant patent dispute ("Dispute Information"). To the extent that we nevertheless receive Dispute Information, directly or indirectly, from your client in the course of Project Gold we will undertake directly to your client that:

- we will treat any Dispute Information in accordance with the terms of paragraphs (a), (b), (e) and (f) of the Confidentiality Agreement between your client and ours dated 14 August 2007 and signed by our client on 10 September 2007;  and

- we will ensure that effective information barriers are in place to prevent Dispute Information being provided to any member of the team acting for ArthroCare Corp in relation to the relevant patent dispute.

We don't really understand your point on discovery - can we please discuss.

Regards,
Ian

_____

Ian Hamilton, Partner
Weil, Gotshal & Manges
One South Place, London, EC2M 2WG, UK
Tel: +44 20 7903 1534
Fax: +44 20 7903 0990
Mob: +44 7775 512 233

_____

<Ian.Lopez@AllenOvery.com>