# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ARTHROCARE CORPORATION,

Plaintiff,

v.

GYRUS MEDICAL, INC., GYRUS ENT, L.L.C., and GYRUS ACMI, INC.,

Defendants.

C.A. No. 07-729-SLR

**REDACTED - PUBLIC VERSION**

## DECLARTION OF IAN HAMILTON

OF COUNSEL:

Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
(202) 682-7000

Jared B. Bobrow
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Nicholas Groombridge
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Kevin Kudlac
Cabrach J. Connor
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway, Ste 1350
Austin, TX 78759
(512) 349-1930

Original Filing Date: February 19, 2008

Redacted Filing Date: February 25, 2008

MORRIS NICHOLS ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200

*Attorneys for Plaintiff ArthroCare Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARTHROCARE CORPORATION,

Plaintiff,

v.

GYRUS MEDICAL, INC., GYRUS ENT,
L.L.C., and GYRUS ACMI, INC.,

Defendants.

C.A. No. 07-729-SLR

**REDACTED –
PUBLIC VERSION**

## DECLARATION OF IAN HAMILTON

Ian Hamilton declares:

1.    I am a partner with Weil, Gotshal & Manges, the UK-affiliated partnership
of Weil, Gotshal & Manges LLP, (together "Weil Gotshal") in the firm's corporate
department and resident in the firm's London office.  I am a solicitor qualified to practice
in England & Wales and my practice consists of advising clients on merger and
acquisition transactions and private equity investments.

2.    I was the partner in day-to-day charge of Weil Gotshal's representation of
Olympus Corporation in its acquisition of Gyrus Group PLC ("Gyrus Group").  On
August 6, 2007, before opening a new matter for the Olympus/Gyrus matter, I requested
a conflict check report on Gyrus Group.  That conflict check report showed a match for
Gyrus Group and, from the information on that report, I concluded that Gyrus Group was
adverse to Weil Gotshal client ArthroCare Corporation.  Because Gyrus Group, as the
target of a proposed acquisition, also was adverse to Olympus, I concluded that no

conflict of interest existed.

3.      Weil Gotshal's London office served as the office of record for the Olympus matter. The deal was staffed primarily with personnel from the London office, but there was a significant cross-border antitrust component that required assistance from antitrust lawyers in New York and Washington. Attorneys in New York also assisted with employee benefits issues.

4.      Weil Gotshal requested that Gyrus Group provide access to certain documents for due diligence purposes. Gyrus Group placed responsive documents in a data room, access to which was strictly controlled. Weil Gotshal personnel were permitted to visit the data room and review documents, but could not make copies. This necessitated repeated visits to the data room to review documents and take notes on each document. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Additional information was exchanged directly between antitrust lawyers at Weil Gotshal and Allen & Overy (unrelated to this litigation), to facilitate obtaining a successful antitrust review result for the deal.

5.      ████████████████████████████████████ ███████████████████████████████████████████████████

6.      On November 13, 2007, four members of the Weil Gotshal Olympus team in London (myself, Edward Jackson, Christopher Smith and Jeremy Smith) participated in a due diligence meeting with Gyrus Group personnel, Allen & Overy representatives

and representatives of Gyrus Group's financial advisers. This was the sole due diligence meeting on the transaction with Gyrus Group representatives at which Weil Gotshal personnel were present. The meeting lasted a little more than an hour and covered numerous topics. During this meeting we only briefly discussed intellectual property matters in three areas. ████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

        7.      As I worked on the Olympus matter in the autumn of 2007, and even during the November 13 due diligence meeting, I had no knowledge that a separate team within Weil Gotshal was preparing to file a patent infringement lawsuit against subsidiaries of Gyrus Group – the conflict check to which I referred above gave no indication of the nature of our representation of ArthroCare. I first learned of the ArthroCare litigation, which was commenced on November 14, 2007, after receiving a telephone call on the evening of November 15, 2007 from Ian Lopez, the partner leading the Allen & Overy team on the acquisition by Olympus, who informed me that a patent infringement lawsuit had been filed against Gyrus Group, and requesting that I attend a meeting the following day to discuss the litigation. However, a short time later Mr. Lopez called me again to let me know that Weil Gotshal represented the plaintiff in the litigation. I agreed with Mr. Lopez that Weil Gotshal should not participate in any way in

3

evaluating the lawsuit or its implications for the transaction.

     8.    I then spoke to Graham Davidson of Perella Weinberg Partners UK LLP, Olympus's financial advisers, to make him aware of this conversation and suggested that he request Freshfields Bruckhaus Deringer (who represented Perella Weinberg on the transaction) to conduct any due diligence necessary to advise Olympus on the litigation.

     9.    Throughout the morning of November 16, 2007, I sought to ensure that we had not received from Gyrus Group any information relating to the litigation. I spoke personally to all members of the Weil Gotshal Olympus team who had any involvement with intellectual property issues and to the two corporate associates coordinating the due diligence exercise, and received verbal confirmation from each of them that they had received no such information. I also sent an e-mail to the Weil Gotshal UK and US antitrust partners on the deal, Douglas Nave and Debra Pearlstein, informing them of the litigation and asking them whether they had received any information relevant to the litigation; both reported that they had not.

     10.    Later that day, Mr. Lopez requested that I confirm the steps I had already taken to preserve the confidentiality of any information relating to the patent dispute and ensure that Weil Gotshal personnel on the ArthroCare litigation had not received access to any information that had been provided to Weil Gotshal in connection with the transaction. Through e-mail correspondence on the same date, I confirmed that Weil Gotshal (1) did not believe it had received any confidential information from Gyrus Group or its counsel relating to the patent dispute; (2) would treat any information related to the patent dispute in accordance with the August 14, 2007 confidentiality letter between Olympus and Gyrus Group; and (3) would ensure that effective screening

mechanisms were put in place to prevent information related to the patent dispute from being provided to any member of the ArthroCare team.

11.     In the same series of emails, I requested Allen & Overy to identify any information provided to Weil Gotshal that related to the ArthroCare patent litigation and which Gyrus Group considered confidential. Allen & Overy declined to do so. Gyrus Group was a UK public company listed and traded on the London Stock Exchange. Accordingly, the transaction was subject to the rules of the City Code on Takeovers and Mergers (the UK Takeover Code). Rule 20.2 of the UK Takeover Code states that information provided to one offeror must, on request, be provided to any other bona fide potential offeror. It is therefore standard practice for a target company's legal and financial advisers to keep a careful record of all information relating to the target company provided to a potential offeror (whether orally or in writing) in order to ensure that Rule 20.2 is properly complied with should a competing bidder emerge. Assuming that this was done, Allen & Overy would have been able to identify any specific non-public documents or information that it believed related to the patent litigation.

12.     The Weil Gotshal Olympus team's due diligence exercise on Gyrus Group was effectively completed by the end of November 16, 2007. Information about Gyrus Group (unrelated to the litigation) after that time continued to be provided directly between the US and UK antitrust lawyers for the purposes of preparing antitrust filings. After November 16, the Weil Gotshal Olympus team then worked throughout the weekend with Olympus and its other advisers and Gyrus Group and its advisers to finalize the terms of the acquisition by Olympus UK Acquisitions Limited. That acquisition was publicly announced on the morning of Monday, November 19, 2007.

5

13.    On November 20, 2007, I sent a memorandum to all persons who had recorded time on the Olympus matter informing them of the existence of the litigation and instructing them, amongst other things, to seek to avoid receiving any information relating to the litigation, to inform me immediately if any such information had been, or was in future, received, and that the litigation should not be discussed with anyone (including others within the firm).

14.    On November 24, 2007, Weil Gotshal memorialized its internal screening process in a memorandum distributed to all personnel worldwide. To the best of my knowledge, this screen has been observed by all Weil Gotshal personnel. No lawyer on the ArthroCare team has received or had access to any information or documents provided by Gyrus Group in connection with the Olympus transaction, either before or after circulation of the screening memorandum. Weil Gotshal has not used any information provided by Gyrus Group during the due diligence process for any purpose except the acquisition.

15.    The UK Takeover Code impresses upon parties to a takeover offer and their advisers the need for absolute secrecy. It is therefore standard practice in Weil Gotshal's London office, prior to the announcement of a public takeover offer, to provide information about that offer to lawyers working on that offer strictly on a "need-to-know" basis. Where possible, code names are used rather than the parties' names so that, even if information inadvertently falls into the hands of someone outside the deal team, the identities of the parties involved are not readily apparent. The Gyrus Group acquisition was code-named "Project Gold" and Gyrus Group was referred to as "Gold" during the due diligence process. Lawyers are frequently reminded of the requirement for secrecy

6

on public takeover offers. These procedures are followed, amongst other reasons, to ensure compliance with the UK Takeover Code and to reduce the risk of any allegation of insider dealing in the target's shares. Accordingly, prior to announcement of the acquisition on November 19, 2007, in my view, it is exceedingly unlikely that anyone not a member of the Weil Gotshal Olympus team received any information related to the transaction.

16.    On November 19, 2007, Olympus and Gyrus Group entered into an Implementation Agreement for the acquisition. The Implementation Agreement bound the parties to complete the transaction upon satisfaction of conditions precedent, such as regulatory approval, and at the same time established each party's rights and obligations in the event the acquisition was not consummated. Upon execution of the Implementation Agreement, I did not in any way consider Gyrus Group to be a client of Weil Gotshal, and nothing in that Agreement indicates otherwise. It remained a separate company, with separate counsel. And while Olympus and Gyrus Group were contractually bound to use reasonable endeavors to satisfy the conditions precedent and consummate the acquisition, I did not at any time consider them to be joint clients of Weil Gotshal.

17.    After execution of the Implementation Agreement, Olympus and Gyrus Group worked cooperatively to satisfy all conditions precedent and consummate the acquisition. Successful completion of the antitrust review process was a critical task during this period. Gyrus Group, through its counsel Allen & Overy, was adamant that it wanted to be an active participant in the antitrust process. It shared information with the Weil Gotshal antitrust team in New York to facilitate the submission of the filings

7

necessary to obtain antitrust clearance. It continued to do this after it had learned that Weil Gotshal represented ArthroCare on the patent litigation against its US subsidiaries.

18.     I advised Olympus on November 16, 2007 of Weil Gotshal's representation of ArthroCare in the patent litigation and indicated that Weil Gotshal intended to continue representing ArthroCare in that matter, including after the closing of the Gyrus Group acquisition. Olympus did not request that Weil Gotshal discontinue work on the acquisition, and Weil Gotshal in fact continues to represent Olympus in relation to certain post-closing matters related to the acquisition. Olympus has instructed Weil Gotshal to protect all privileged information and communications and strictly abide by all confidentiality obligations undertaken in connection with the Gyrus Group acquisition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at London, England, on February 19, 2008.

Ian Hamilton

## CERTIFICATE OF SERVICE

I, James W. Parrett, Jr., hereby certify that copies of the foregoing were caused to be served on February 25, 2008 upon the following in the manner indicated:

### VIA ELECTRONIC MAIL
### and HAND DELIVERY

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Hercules Plaza – 6th Floor
Wilmington, DE  19801

### VIA ELECTRONIC MAIL

Darle M. Short
Thomas J. Pardini
Daniel A. Tanner, III
Daniel M. Schneider
Oliff & Berridge, PLC
277 S. Washington Street, Ste. 500
Alexandria, VA  22314


/s/ James W. Parrett, Jr.
James W. Parrett, Jr. (#4292)